# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF ILLINOIS

BENJAMIN ALLEN RODGERS,

    Plaintiff,

vs.

NANCY A. BERRYHILL, Acting
Commissioner of Social Security,

    Defendant.[1]

Civil No. 16-cv-575-JPG-CJP

## MEMORANDUM and ORDER

In accordance with 42 U.S.C. § 405(g), plaintiff Benjamin Allen Rodgers, represented by counsel, seeks review of the final decision of the Commissioner of Social Security denying his application for Disability Insurance Benefits ("DIB") pursuant to 42 U.S.C. § 423.

## Procedural History

Plaintiff applied for disability benefits in November 2014, alleging disability beginning on September 25, 2013. After holding an evidentiary hearing, Administrative Law Judge ("ALJ") Kevin R. Martin denied the application in a decision dated December 10, 2015. (Tr. 22-36). The Appeals Council denied plaintiff's request for review, and the ALJ's decision became the final agency decision subject to judicial review. (Tr. 1). Plaintiff has exhausted his administrative remedies and has filed a timely complaint in this court.

## Issues Raised by Plaintiff

Plaintiff raises the following issues:

    1.    The ALJ failed to consider whether he was entitled to a closed period of disability.

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security. See, *Casey v. Berryhill*, 853 F.3d 322 (7th Cir. 2017). She is automatically substituted as defendant in this case. See Fed. R. Civ. P. 25(d); 42 U.S.C. §405(g).

2. The ALJ failed to analyze all relevant evidence in assessing plaintiff's residual functional capacity ("RFC").

3. The credibility determination was erroneous.

## **Applicable Legal Standards**

To qualify for DIB, a claimant must be disabled within the meaning of the applicable statutes. For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A). A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. 42 U.S.C. §§ 423(d)(3) and 1382c(a)(3)(C). "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit. 20 C.F.R. §§ 404.1572.

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Weatherbee v. Astrue*, 649 F.3d 565, 568-569 (7th Cir. 2011).

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience. 20 C.F.R. §§ 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-513 (7th Cir. 2009); *Schroeter v. Sullivan*, 977 F.2d 391, 393 (7th Cir. 1992).

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three. If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Secretary at step five to show that the claimant can perform some other job. *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984). *See also*, *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001)(Under the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled…. If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made. It is important to understand that the scope of judicial review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g). Thus, this Court must determine not whether plaintiff was, in fact, disabled, but whether the ALJ's

findings were supported by substantial evidence and whether any errors of law were made. *See*, *Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996) (citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)). This Court uses the Supreme Court's definition of substantial evidence, i.e., "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997). However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. *See, Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

### The Decision of the ALJ

ALJ Martin followed the five-step analytical framework described above. He determined that Mr. Rodgers had not been engaged in substantial gainful activity since the alleged onset date and that he was insured for DIB through December 31, 2019.

The ALJ found that plaintiff had severe impairments of multiple injuries suffered in a parachuting accident, including multiple lower extremity fractures and knee instability; obesity; and adjustment disorder. He found that these impairments do not meet or equal a listed impairment.

ALJ Martin concluded that plaintiff had the residual functional capacity to perform work at the sedentary exertional level, limited to occasional climbing of ramps and stairs; no climbing of ropes, ladders and scaffolding; occasional balancing, stooping, kneeling, crouching, and crawling;

and occasional push/pull with the left lower extremity. He also had mental limitations in that he was restricted to understanding, remembering and carrying out simple instructions; only occasional interactions with coworkers and supervisors; only incidental interaction with the public; and only routine changes in the workplace.

Based on the testimony of a vocational expert (VE), the ALJ determined that plaintiff could not do his past work, but he could perform other jobs which exist in significant numbers in the national and local economies, and, therefore, he was not disabled.

## **The Evidentiary Record**

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the points raised by plaintiff.

**1.    Agency Forms.**

Plaintiff was born in October 1988 and was almost 25 years old on the alleged date of onset. (Tr. 203). He was on active duty in the United States Army at the time of his injury. (Tr. 208).

In January 2015, plaintiff was in the process of being medically discharged from the Army. He was living in Army barracks at Ft. Bragg, N.C. He stated that he needed to use a cane and a brace for chronic pain in his legs, ankle and knees. (Tr. 227-228).

By July 2015, plaintiff had moved back to Illinois. He reported that he spent half of the day with his feet elevated because of pain, swelling and fatigue. On a good day, he could be on his feet for an hour or so. He did household chores, but everything took him longer. His "constant pain" made him short-tempered. He took Zoloft, Prilosec and Naproxen. (Tr.

254-264).

**2.     Evidentiary Hearing**

Plaintiff was represented by counsel at the evidentiary hearing in November 2015. (Tr. 43). Plaintiff suffered a pelvic fracture and fractures of both his legs in the accident. He still had daily pain and swelling in his left ankle, pelvis and knees. His condition was described as "traumatic arthritis." He used a knee brace if he was going to walk long distances. He could be on his feet for about an hour, and could sit for about an hour before having to change positons. He took Naproxen. (Tr. 47-49).

Plaintiff had been diagnosed with anxiety and adjustment disorder. It was difficult for him to communicate or to "deal with day-to-day civilians." He took Zoloft. He went to "behavioral health" at Fort Bragg, but had not had treatment since coming home because he was not forced to deal with a lot of people. (Tr. 50).

Mr. Rodgers testified that he usually spent about half of the day with his legs elevated to reduce his pain. (Tr. 50-51). He had pain and swelling, more in one leg. (Tr. 56). He rode an exercise bike once or twice a week, for thirty minutes at the most because that was as long as he could handle sitting on it. (Tr. 52). Household chores took longer because he had to take breaks. (Tr. 57).

A vocational expert (VE) also testified. The ALJ asked the VE to assume a hypothetical question which corresponded to the RFC assessment. The VE testified that this hypothetical person could not do plaintiff's past work, but he could do jobs which exist in significant numbers, such as lens inserter, dowel inspector, and document preparer. (Tr. 60-62). He would not be able to do those jobs if he needed to elevate his feet throughout the day. (Tr. 66).

6

### 3. Medical Records.

Plaintiff suffered fractures of the pelvis, left ankle and knee, and right tibia, as well as an ACL tear of the left knee in a parachuting accident. He had surgery at University of North Carolina Hospital ("UNC") on September 27, 2013, consisting of open reduction and internal fixation of his fractures. (Tr. 324-327). He was in an inpatient rehabilitation unit until October 11, 2013. At discharge, his right knee was in an immobilizer and his left knee was in a hinged brace. He was in a wheelchair and weightbearing status was touchdown only on both legs. (Tr. 406-407).

In December 2013, plaintiff was permitted to bear weight as tolerated and to begin physical therapy. However, he had persistent delayed union of the left ankle fracture, which required more surgery. (Tr. 415-416). Open reduction and internal fixation with bone graft were performed in February 2014. (Tr. 417-419). He was permitted to bear weight in March 2014 and was to begin physical therapy. (Tr. 422). On May 22, 2014, a doctor at UNC noted that he was walking without an assistive device. He had some soreness and pain in the ankle and some pain radiating down the back of his leg, but was otherwise making appropriate progress. The hardware was well-aligned with healing at the previous nonunion site. He was to continue to work on range of motion and continue activity as tolerated. (Tr. 423-424).

Plaintiff was treated at Womack Army Medical Center until early 2015. He received outpatient physical therapy there. He was evaluated by Dr. Huang in July 2014. He reported pain over the lateral aspect of the left ankle where he had bone grafting. He said he could stand for about 40 minutes and walk for about 2 to 3 hours, with pain. He also had pain and morning stiffness in the left hip and constant aching in his left knee. X-rays were done. Dr. Huang noted

that there were "multiple issues," including a persistent gap in the pelvic fracture and possible incomplete healing of the left fibula. In addition, he had left knee instability which appeared to be due, in part, to ligament instability which may need surgical intervention. (Tr. 772-775). Dr. Huang saw plaintiff again after CT scans and MRI studies were done of his pelvis, knees and left ankle. Dr. Huang concluded that there was damage to the lateral joint space of the right knee which presented a high risk of early onset of knee arthritis. There was a tear of the ACL of the left knee; he recommended initial treatment of physical therapy and knee bracing. The pelvic fracture showed enough healing that no further intervention was needed in the immediate future. Joint space damage could be expected to result in hip pain and early arthritis. The left sacroiliac joint disruption and pelvic diastasis[2] could cause chronic pain. In the left ankle, the fibula fracture showed insufficient healing. There were an articular joint step-off and joint narrowing in the ankle joint itself, which made chronic ankle pain and early onset of arthritis likely. (Tr. 744-745).

At a physical therapy evaluation on July 23, 2014, plaintiff indicated that he could "walk and stand for up [to] 2 hours at a time, after that he is limping 'pretty bad.'" He reported constant pain in his left ankle with weightbearing activities. He had moderate ankle edema and edema over the distal third of the left leg. His gait was antalgic. The motion in his left ankle had not improved, which was causing alterations in his gait and increased pain and discomfort. (Tr. 741-742).

On July 25, 2014, it was noted that he walked slowly and had a limp. He was taking Tramadol for pain and said it was "somewhat effective." (Tr. 728).

---

[2] Diastasis is "dislocation or separation of two normally attached bones between which there is no true joint." http://medical-dictionary.thefreedictionary.com/diastasis, visited on June 20, 2017.

Dr. Kenneth Nelson saw plaintiff in the orthopedic clinic at Womack in August 2014. Plaintiff complained of pain in his posterior left ankle. He had undergone "a great deal of physical therapy" but was still stiff. Dr. Nelson found tenderness to palpation along the Achilles tendon. X-rays showed traumatic arthritis in the left ankle. He prescribed an anti-inflammatory (Mobic) and recommended 6 weeks of stretching exercises. Dr. Nelson doubted that plaintiff could return to full duty with the degree of ankle osteoarthritis that he had. (Tr. 720).

On August 22, 2014, Dr. Huang prescribed a brace for plaintiff's left knee because it was giving way on him. (Tr. 711-712). A left hip x-ray done in September 2014 showed no hardware fracture, but there was lucency around the sacroiliac joint screw, described as suspicious for loosening. An x-ray of the left foot suggested incomplete union of a fifth metatarsal fracture. (Tr. 605-606).

On September 19, 2014, Dr. Nelson noted considerably less tenderness along plaintiff's left Achilles tendon. He prescribed Naprosyn. (Tr. 676).

Plaintiff told an occupational therapist In October 2014 that he was not concerned with looking for work when he was discharged from the Army because he had a job waiting with his father's company. (Tr. 669).

Plaintiff was diagnosed with left foot collapse and plantar fasciitis in November 2014. He was prescribed night splints and arch support, along with stretching exercises. (Tr. 652).

Plaintiff also received mental health treatment at Womack, beginning in July 2014. He attended regular counseling sessions with a social worker and was seen by a psychiatrist. (Tr. 453-540). On the first visit, he said that his case manager had been trying to get him to seek mental health services for a while. He reported being angry and having low tolerance for others.

He could not tolerate crowds and felt overwhelmed. (Tr. 520). He was diagnosed with adjustment disorder with anxiety and depressed mood. A psychiatrist started him on Zoloft in August 2014. (Tr. 477-479). He stopping going to counselling in October 2014 because he did not feel like it was benefitting him. (Tr. 485). The VA rated plaintiff as 90% disabled in March 2015. (Tr. 171).

After his discharge from the Army, plaintiff returned to Illinois. He received primary health care through the Effingham Illinois Community Based Outpatient Clinic, which is affiliated with the VA Medical Center in Marion, Illinois. (Tr. 1264-1264). Dr. Lizzette Colon was his primary care physician. In March 2015, she saw him for the first time. He complained of leg cramps and pain in his knees, ankles and hips. He denied depression and anxiety. On exam, she found no pedal edema, normal range of motion and no joint swelling in the extremities. His gait was normal. He weighed 226 pounds and was 70 inches tall. She prescribed Naprosyn for his hip pain. He declined a referral for mental health treatment, but agreed to continue taking Zoloft. (Tr. 1270-1275).

Dr. Colon ordered a functional capacity evaluation in connection with plaintiff's social security disability application. The evaluation was done by a physical therapist in August 2015. Plaintiff has a mild antalgic gait and limited range of motion of the left ankle, left hip and right knee. He had some weakness of the left ankle, knee and hip, with chronic pain of the lower extremities and "decreased tolerance for sitting or standing activities." (Tr. 1204-1295).

Dr. Colon saw plaintiff again in August 2015. Her findings on physical exam were all normal. She filled out a report for plaintiff's social security application.

Dr. Vittal Chapa performed a consultative physical exam in April 2015. He found that plaintiff had decreased range of motion of the left ankle and muscle atrophy in the left leg. He was wearing a brace on his left knee. He had internal derangement of the left knee. (Tr. 1219-1224).

Jerry Boyd, Ph.D., performed a consultative psychological exam in April 2015. He concluded that plaintiff was able to understand, carry out and remember both complex and one-two step instructions, but he had temper/frustration issues and his chronic pain condition would be expected to interfere with persistence and cause a reduced stress tolerance. (Tr. 1214-1217).

4. **Dr. Colon's Opinion.**

Dr. Colon assessed plaintiff's functional capacity by filling out a form in August 2015. Her "objective findings" were the findings indicated by the physical therapist on the functional capacity evaluation. She indicated that plaintiff would need to take extra breaks during the workday and would likely be absent from work about 3 times a month. (Tr. 1258-1260).

5. **Mental RFC Assessment.**

A state agency consultant assessed plaintiff's mental RFC based on a review of the file materials. She indicated that plaintiff was moderately limited in his ability to maintain attention and concentration for extended periods. In the "additional explanation" section of the form, she said that "difficulty sustaining performance will limit him to simple operation of a routine and unskilled nature." (Tr. 82-83).

## Analysis

The Court turns first to plaintiff's challenge to the ALJ's credibility findings.

Plaintiff argues that the ALJ erred in his credibility determination because he relied too heavily on his daily activities and misstated or misconstrued some of the evidence.

The credibility findings of the ALJ are to be accorded deference, particularly in view of the ALJ's opportunity to observe the witness. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). Social Security regulations and Seventh Circuit cases "taken together, require an ALJ to articulate specific reasons for discounting a claimant's testimony as being less than credible, and preclude an ALJ from 'merely ignoring' the testimony or relying solely on a conflict between the objective medical evidence and the claimant's testimony as a basis for a negative credibility finding." *Schmidt v. Barnhart*, 395 F.3d 737, 746-747 (7th Cir. 2005), and cases cited therein.

SSR 96-7p requires the ALJ to consider a number of factors in assessing the claimant's credibility, including the objective medical evidence, the claimant's daily activities, medication for the relief of pain, and "any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms." SSR 96-7p, 1996 WL 374186 at *3.[3]

The ALJ is required to give "specific reasons" for his credibility findings. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). It is not enough just to describe the plaintiff's testimony; the ALJ must analyze the evidence. *Ibid*. *See also, Terry v. Astrue*, 580 F.3d 471, 478 (7th Cir. 2009)(The ALJ "must justify the credibility finding with specific reasons supported by the record.") If the adverse credibility finding is premised on inconsistencies between plaintiff's statements and other evidence in the record, the ALJ must identify and explain those

---

[3] SSR 96-7p was superseded by SSR 16-3p, 2016WL1119029. SSR 16-3p became effective on March 28, 2016. See, 2016 WL 1237954, setting forth the effective date. SSR 16-3p eliminates the use of the term "credibility," and clarifies that symptom evaluation is "not an examination of an individual's character." 2016WL1119029, at *1. SSR 16-3p continues to require the ALJ to consider the factors set forth above, which are derived from the applicable regulations. 2016WL1119029, at 5.

12

inconsistencies. *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001).

Here, the reasons given by the ALJ for rejecting plaintiff's statements are not supported by the record and are not valid. ALJ Martin said that he found plaintiff not credible because of his daily activities, plaintiff's statement that he had a job waiting for him after his discharge from the Army, and his claim that he had to elevate his feet. (Tr. 31-32).

The ALJ described plaintiff's daily activities as assisting in caring for a puppy, cooking simple meals, shopping, driving, doing household chores, riding a bike for 30 minutes twice a week, standing and walking for 2 hours at a time, and using a riding mower.

It is, of course, appropriate for the ALJ to consider daily activities when evaluating credibility, but "this must be done with care." *Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013). The Seventh Circuit has called improper consideration of daily activities "a problem we have long bemoaned, in which administrative law judges have equated the ability to engage in some activities with an ability to work full-time, without a recognition that full-time work does not allow for the flexibility to work around periods of incapacitation." *Moore v. Colvin*, 743 F.3d 1118, 1126 (7th Cir. 2014).

The ALJ nowhere explained how plaintiff's relatively modest daily activities are, as he concluded, "not consistent with his extreme allegations." The ALJ misconstrued or misstated the evidence with regard to some of his activities. Plaintiff told Dr. Boyd, the consultative psychologist, that he was "watching a puppy" at the exam in April 2015. (Tr. 1216). The ALJ asked him no questions about watching a puppy, and the record contains no evidence that the physical or mental requirements of watching a puppy exceeded plaintiff's alleged limitations. Plaintiff did admit in a Function Report to doing household chores, but he also alleged that he had

13

to take breaks and everything took longer. He also admitted to making meals such as sandwiches and frozen dinners. (Tr. 256). He told Dr. Boyd that, if he worked in the yard one day, he would be "miserable" for the next two or three days. (Tr. 1214). Plaintiff also said that he drove only when it was necessary and shopped for groceries for about an hour every two weeks. (Tr. 257). These activities simply are not inconsistent with plaintiff's claims. *See, Shramek v. Apfel*, 226 F.3d 809, 813 (7th Cir. 2000)(holding that plaintiff's ability to care for her house and children did not contradict plaintiff's testimony that she was limited in performing prolonged sitting, standing and walking.).

Further, the ALJ misstated plaintiff's use of a bike. He did not say he rode a bike two days a week; he testified that he rode a stationary bike once or twice a week, for thirty minutes at the most, and that thirty minutes was "about as long as I can handle sitting on it." (Tr. 52). More seriously, the ALJ misstated plaintiff's testimony about elevating his feet. The ALJ said that plaintiff alleged that he "must constantly elevate his legs due to swelling" and noted that the medical records documented no lower extremity swelling for the last year. (Tr. 32). In fact, plaintiff never said he had to "constantly" elevate his legs due to swelling. Rather, plaintiff testified that, on a typical day, he spent "about half of it with my leg elevated, [to] try and reduce the pain that I go through." (Tr. 51).

Lastly, the ALJ noted that plaintiff told an occupational therapy assistant at Womack that "he has a job waiting with hid dads [sic] company when he retires from the military [and] therefore is not concerned with looking for employment." (Tr. 32, citing Tr. 669). Plaintiff made this statement in October 2014, a little over a year after his accident. At the hearing, he testified that he was referring to the factory where his father worked, not a company owned by his

14

father, and that the jobs there were physical labor requiring ability to be on your feet all day and to lift 50 pounds consistently. (Tr. 54). It is difficult to understand what the ALJ meant by highlighting this statement. According to the ALJ, plaintiff is limited to sedentary work, so he could not do the job that was waiting for him at his father's factory. It is entirely unclear how making that statement in October 2014, when he was still recovering from his injuries, detracts from the credibility of his later statements.

The erroneous credibility determination requires remand. "An erroneous credibility finding requires remand unless the claimant's testimony is incredible on its face or the ALJ explains that the decision did not depend on the credibility finding." *Pierce v. Colvin*, 739 F.3d 1046, 1051 (7th Cir. 2014).

Reconsideration of plaintiff's credibility will also require a "fresh look" at the medical opinions and plaintiff's RFC, as well as whether plaintiff is at least entitled to a closed period of disability. *Pierce, Ibid.* It is therefore not necessary to analyze plaintiff's other points in detail. The Court nevertheless makes the following observations with regard to the weighing of the medical opinions regarding plaintiff's mental limitations.

The ALJ stated that he gave "significant weight" to the opinions of Drs. Boyd, Brister and Mehr. Dr. Boyd examined plaintiff. Among his other conclusions, he opined that plaintiff's "chronic pain condition would reasonably be expected to interfere with persistence." Based on a review of the medical records, including Dr. Boyd's report, Drs. Brister and Mehr opined that plaintiff was moderately limited in his ability to maintain attention and concentration for extended periods. (Tr. 82, 98).

15

The ALJ's RFC assessment and the hypothetical question posed to the VE must both incorporate all of the limitations that are supported by the record. *Yurt v. Colvin*, 758 F.3d 850, 857 (7th Cir. 2014). This is a well-established rule. See, *Stewart v. Astrue*, 561 F.3d 679, 684 (7th Cir. 2009)(collecting cases). If the ALJ finds that a plaintiff has a moderate limitation in maintaining concentration, persistence or pace, that limitation must be accounted for in the hypothetical question posed to the VE; in most cases, limiting the plaintiff to simple, repetitive tasks or to unskilled work is not sufficient to account for moderate concentration difficulties. *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 620 (7th Cir. 2010). Here, despite giving "significant weight" to the opinions regarding plaintiff's mental RFC, the ALJ did not refer to plaintiff's moderate limitation in maintaining pace in his RFC assessment or in the hypothetical question posed to the VE. On remand, the ALJ should be mindful of this rule.

The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that plaintiff is disabled or that he should be awarded benefits. On the contrary, the Court has not formed any opinions in that regard, and leaves those issues to be determined by the Commissioner after further proceedings.

## Conclusion

The Commissioner's final decision denying Benjamin Allen Rodgers' application for social security disability benefits is **REVERSED and REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence <u>four</u> of **42 U.S.C. §405(g).**

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**

**DATE:** 6/26/2017

*s/J. Phil Gilbert*
**J. PHIL GILBERT**
**U. S. DISTRICT JUDGE**